**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN LEWERT, on behalf of himself and all others similarly situated, | ) ) ) | |
| | ) | Case No. 13-cv-9040 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VENDINI, INC., a California corporation, | ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff John Lewert ("Plaintiff") brings this Class Action Complaint against Defendant Vendini, Inc. ("Vendini"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this class action against Vendini for its failure to secure and safeguard its consumers' personal and financial information.

2.    Vendini offers online and box-office ticketing solutions to hundreds of event holders ("Venues"), including credit and debit card processing services for ticket purchases. In exchange for its credit and debit card processing services, Vendini charges the Venue a fee (Vendini's "Service Fee").

3.    However, the Venue's consumers explicitly pay for Vendini's Service Fee when they purchase tickets from the Venue. For example, when consumers click on the link to purchase tickets on the Venue's website, they are frequently redirected to *Vendini's* website, where consumers are charged a separate "Ticketing Operation Fee" as part of the transaction. In

other instances, consumers pay the Service Fee when they purchase their tickets on the Venue's website (but without being redirected to Vendini's website).

4.     During the purchases, Vendini collects and stores consumers' personal and financial information, including names, addresses, email addresses, phone numbers, and credit and debit card numbers and expiration dates ("PII").

5.     On or about June 27, 2013, Vendini began disclosing to the public that a third-party criminal actor (the "Hacker") infiltrated Vendini's databases and accessed consumers' PII on March 29, 2013 (the "Security Breach").

6.     The Security Breach poses a particularly dangerous hazard to consumers—including Plaintiff and the Class—given that the specific combination of PII accessed by the Hacker creates serious threats of identity theft or conversion of financial accounts.

7.     The Security Breach was caused and enabled by Vendini's knowing violation of its obligations to abide by best practices and industry standards concerning protection of consumers' PII. Vendini grossly failed to comply with security standards and allowed consumers' PII to be compromised by cutting corners on security measures that could have prevented or mitigated the Security Breach.

8.     Also, Vendini failed to provide adequate and prompt notice to consumers regarding the Security Breach, and, thus, prevented (and continues to prevent)[1] Plaintiff and other Class members from protecting themselves from repercussions of the Security Breach.

9.     Accordingly, Plaintiff, on behalf of himself and the Class, asserts claims for breach of implied contract, or in the alternative, unjust enrichment, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*., ("ICFA").

_____

[1] While Vendini notified some consumers beginning in June 2013, it maintains the position that it is not responsible for notifying consumers. On information and belief, Vendini has not provided notice to all Class members.

Plaintiff seeks injunctive relief, declaratory relief, monetary damages (including actual and punitive damages), attorneys' fees, and all other relief as authorized in equity or by law.

## II.    JURISDICTION AND VENUE

10.    This Court has diversity jurisdiction under 28 U.S.C. § 1332(d) because: (a) at least one member of each putative class is a citizen of a state different from Vendini; (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) none of the exceptions under that subsection apply to this action.

11.    This Court has personal jurisdiction over Vendini under the Illinois long-arm statute, 735 ILCS 5/2-209, because Vendini conducts substantial business in this State and a substantial portion of the wrongdoing alleged in this Complaint took place in and/or was directed toward the State of Illinois. Vendini, by transacting substantial amounts of business in Illinois, has sufficient contacts in this State to render the exercise of jurisdiction permissible.

12.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2), because Vendini conducts substantial business in this District and because a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this District.

## III.    PARTIES

*Plaintiff*

13.    Plaintiff John Lewert is an individual domiciled in Cook County, Illinois. For purposes of 28 U.S.C. § 1332, Plaintiff is a citizen of the State of Illinois.

*Defendant*

14.    Defendant Vendini is a corporation organized in and existing under the laws of the State of California with its principal place of business in San Francisco County, California. For purposes of 28 U.S.C. § 1332, Vendini is a citizen of the State of California.

## IV.  FACTUAL BACKGROUND

*Vendini's Business Model*

15.     Vendini contracts with Venues for box-office and online ticketing solutions. These solutions include setting up websites for Venues which enable consumers to purchase tickets for an event at a Venue. In addition, Vendini processes consumers' ticket purchases made at a Venue's box-office and online using a credit or debit card. During these transactions, Vendini collects and stores consumers' PII on its physical and cloud-based computer databases.

16.     Vendini proclaims that it has seen "tremendous growth over the years,"[2] including contracting with hundreds of Venues and collecting and storing the PII of over a million consumers.[3]

17.     In exchange for its services, Vendini charges Venues a Service Fee. Consumers, however, pay the Service Fee when they purchase their tickets.[4]

18.     The cost of the Service Fee varies depending on whether the ticket is purchased online or at a box-office. If the ticket is purchased online, Vendini's Service Fee costs consumers

---

[2]     Mark Tacchi, President & CEO, Statement to Valued Customers, http://www.vendini.com/company/index.html (last accessed Nov. 11, 2013).

[3]     *See* Vendini Late in Notifying Customers of Hack Attack, San Francisco Examiner (June 5, 2013), http://www.examiner.com/article/vendini-late-in-notifying-consumers-of-hack-attack (last accessed Nov. 11, 2013).

[4]     *See* Kitty Getlik, Kesley Theater Announces the Arrival of Vendini, Mercer County Community College (September 25, 2007), www.mccc.edu/~humphrew/whatsnew/vendini.htm (describing the Service Fee); *see also* Cabrillo College, VAPA Box Office Service Fees (Mar. 28, 2013) ("Box office service fees for full online and in-person pre-sales and event sales/support [include] credit card and online purchase fees assessed through Vendini Patron Management System."), http://www.cabrillo.edu/internal/divisions/vapa/events/rentals/VAPA%20Venue%20User%20Fees%203-28-13.pdf (last accessed Nov. 11, 2013); Fresno State University, Vendini Credit Card Service Fees (Mar. 22, 2013), http://www.fresnostate.edu/artshum/music/documents/Vendini%20Fee%20Chart.pdf (last accessed Nov. 11, 2013); Texas Opry Theater, Disclaimer Regarding Vendini Convenience Fee, http://texasoprytheater.com/ ("Vendini Service fee of $.85 • Facility Fee of $1.00 • Credit Card Processing Fee of approx. 3.50% face value of the total ticket purchase.") (last accessed Nov. 11, 2013).

approximately 3.5% of the purchase price of the ticket. If the ticket is purchased at the Venue's box-office, Vendini's Service Fee costs approximately $ 0.85.[5]

19.    Consumers explicitly pay Vendini's Service Fee when purchasing tickets through the Venue, either because the Venue states on its website that the consumer is being charged a fee for Vendini's ticketing and processing services,[6] or because the consumer is redirected to Vendini's website. Where the latter occurs, the consumer is taken to a screen that states "Ticketing by Vendini" in the lower left-hand corner, as depicted here:



20.    After selecting the number of tickets, the customer is charged a "Ticketing Operation Fee."

21.    In exchange for paying the Service Fee, consumers expect the entity that processes the transactions and collects their PII—Vendini—will use industry best practices and

---

[5] *See id.* (describing the Service Fee).
[6] *See, e.g.,* Getlik, *supra* note 4.

commercially reasonable data security measures to protect their PII and that they will be promptly notified should their PII be breached.

22.     However, Vendini does not disclose that it would not provide commercially reasonable data security measures or adequate and prompt notice directly to consumers of unauthorized access to their PII.

***The Security Breach***

23.     On or about March 29, 2013, the Hacker accessed consumers' PII through Vendini's database without authorization. Vendini, however, failed to detect the Security Breach until April 25, 2013.

24.     According to Vendini, the Security Breach included unauthorized access of consumers' "personal information, such as name, mailing address, email address, phone number, and credit card numbers and expiration dates."[7]

25.     Interested persons and entities continue attempting to assess the full scope of the Security Breach. For example, one source gathered a list of Venues that contracted with Vendini for ticket processing services based on inquiries to various State Attorneys General.[8] That list contains nearly 40 colleges, community theaters, and art and music groups. The PII of every customer who purchased a ticket at one of those Venues—numbering in the thousands—was exposed as a result of the Security Breach. That list, however, does not contain every Venue that contracted with Vendini. Therefore, the number of affected Venues and, by extension, affected consumers, is far greater—expected to be at least one million.[9]

---

[7] Mark Tacchi, *Statement from Vendini Regarding Unauthorized Entry into its Systems* (May 21, 2013), https://www.vendini.com/e/a.php?id=1588&v=033e5b49d7.
[8] Office of Inadequate Security, Vendini Breach Update (July 2, 2013), http://www.databreaches.net/vendini-breach-update.
[9] *See, e.g.*, Vendini Late in Notifying Customers of Hack Attack, San Francisco Examiner (June 5, 2013), http://www.examiner.com/article/vendini-late-notifying-consumers-of-hack-attack.

26.     Even by Vendini's own admission, the number of consumers affected by the Security Breach would encompass anyone who "used a credit card to make a purchase for an event through Vendini's services."[10]

27.     Vendini failed to use adequate data security measures to protect consumers' PII. For example, on information and belief, Vendini did not adequately encrypt PII on its physical and cloud-based computer systems.[11] Instead Vendini relied on security features similar to "perimeter security." Perimeter security is limited to preventing a hacker from accessing a network or a database. Data encryption and key management, however, focuses on securing the data within the network or database in the event a hacker slips past the perimeter security.

28.     Vendini allowed widespread and systematic theft of consumers' PII. Vendini's actions did not meet the standards of commercially reasonable steps that should be taken to protect consumers' PII, including their credit and debit card information. Vendini failed to employ appropriate technical, administrative, or physical procedures to protect consumers' PII from unauthorized capture, dissemination, or misuse, thereby making consumers easy targets for theft and misuse of their financial information, including in the manner undertaken by the Hacker here.

***Vendini Failed To Provide Sufficient Notice Of The Data Breach To Class Members***

29.     Furthermore, Vendini aggravated the damage to consumers from the Security Breach by failing to provide adequate and prompt notice. Consumers were and are entitled to adequate and prompt notification about the data breach to help them mitigate the harm and avoid

---

[10] Mark Tacchi, *Statement from Vendini Regarding Unauthorized Entry into its Systems* (May 21, 2013), https://www.vendini.com/e/a.php?id=1588&v=033e5b49d7.

[11] *See* Tina Stewart, Vendini Data Breach — An Ounce of Prevention, Vormetric (June 2013), http://blog.vormetric.com/2013/06/25/vendini-data-breach-an-ounce-of-prevention.

additional instances of fraud as alleged herein. Vendini, however, failed to take reasonable steps to notify consumers that their information has been compromised.

30.     On May 21, 2013, almost four weeks after Vendini allegedly first learned of the Security Breach—Vendini finally posted a statement on its own blog. On Vendini's website, Vendini stated that it had "detected an unauthorized intrusion into its systems."[12] The notice further states "[u]pon discovering this intrusion, we engaged computer forensic and cyber security experts to commence an investigation."[13]

31.     Although Vendini's online blog contains language designed to reassure the reader that Vendini "implemented enhanced security measures designed to prevent a *recurrence* of this type of incident,"[14] Vendini fails to acknowledge their failure to implement proper security measures *prior* to the Security Breach.

32.     Despite being the entity that collected and stored consumers' PII, Vendini continues to assert that it is not responsible for directly notifying consumers of the Security Breach and did not begin to do so until late June 2013.[15]

33.     Vendini did not notify Plaintiff until June 27, 2013—over two months after Vendini's inadequate security finally detected the Security Breach. Vendini contends that it delayed notification to further a law enforcement investigation.

34.     Rather than take responsibility for the failures that resulted in the Security Breach, Vendini has placed the burden on aggrieved consumers like Plaintiff and the other Class

---

[12] *See* Mark Tacchi, *Statement from Vendini Regarding Unauthorized Entry into its Systems* (May 21, 2013), https://www.vendini.com/e/a.php?id=1588&v=033e5b49d7.
[13] *Id.*
[14] *Id.* (emphasis added).
[15] *See* Vendini Letter to New Hampshire Attorney General (June 21, 2013), *available at* http://oag.ca.gov/sites/all/files/agweb/pdfs/privacy/2012data_breach_rpt.pdf.

members to either self-monitor their accounts and credit reports for years to come or spend time and money on fraud alerts or credit-report security freezes.

35.     *At no time* has Vendini offered credit monitoring or identity theft protection assistance to Plaintiff or the other Class members, nor has Vendini taken any affirmative steps to make Class members whole for the damages arising out of Vendini's conduct.

***Vendini's Contractual Obligation to Protect Customer Information***

36.     Vendini accepts customer payment for ticket purchases made by credit and debit cards issued by members of the payment card industry ("PCI"), such as Visa USA ("Visa"), MasterCard, Discover, and American Express.

37.     Some PCI members founded the PCI Security Standards Council which developed a Data Security Standard ("DSS") applicable to all merchants that store, process, or transmit cardholder data.

38.     Visa, like other PCI members that allow Vendini to process payments through their networks, imposes several other requirements.

39.     At all times relevant to this action, Vendini was authorized by PCI members, including Visa, to accept credit and debit cards for the payment of personal goods.

40.     Vendini is contractually obligated to fully comply with all of the DSS requirements and individual PCI members' requirements as a condition of being permitted to process transactions through the PCI members' networks.[16]

41.     The DSS offers a simple approach to protecting sensitive data. The requirements include: protection of stored "cardholder data;" restriction of access to cardholder data by

---

[16]     Visa PCI Data Security Compliance Program (2010) *available at* http://usa.visa.com/download/merchants/cisp_overview.pdf (last accessed Nov. 12, 2013).

business need to know; and tracking and monitoring of all access to network resources and cardholder data.[17]

42.     According to the DSS, "cardholder data" includes "[a]t a minimum . . . the full [*Primary Account Number*]. . . . plus any of the following: *cardholder name, expiration date* and/service code."[18]

43.     This data and more, however, is the same data that Vendini did not adequately protect.

44.     PCI members, such as Visa, warn that "[t]he threat of data [or PII] piracy is real, and simple procedures can and must be taken to anticipate it—and to spot crimes quickly when thieves momentarily succeed."[19]

*Industry Best Practices and Standards*

45.     In addition to the DSS requirements, merchants observe commercially reasonable best practices that include, but are not limited to, encryption and key management for both structured data in databases and unstructured data within file systems and storage volumes. These practices include data encryption of cardholder data stored on physical and cloud-based systems—the kind of systems used by Vendini.

46.     In a 2012 report on data breaches throughout the State of California, the California Attorney General stated, "If encryption had been used, over 1.4 million Californians would not have had their information put at risk in 2012." Based on the staggering number of individuals who had their information put at risk, the California Attorney General recommended

---

[17] PCI DSS, Requirements and Security Assessment Procedures 28-58 (Oct. 2010), *available at* https://www.pcisecuritystandards.org/documents/pci_dss_v2.pdf (last accessed Nov. 12, 2013).
[18] PCI DSS, Glossary of Terms, Abbreviations, and Acronyms 2 (Oct. 2010), *available at* https://www.pcisecuritystandards.org/documents/pci_glossary_v20.pdf (last accessed Nov. 12, 2013).
[19] Visa's Business Guide to Data Security, http://usa.visa.com/merchants/risk_management/data_security_demo/m1/index.htm (last accessed Nov. 12, 2013).

"that companies and agencies implement encryption as a basic protection and reasonable security measure to help them meet their obligation to safeguard personal information entrusted to them."[20]

47.    Vendini, however, failed to use commercially adequate data security measures, including, but not limited to, adequate encryption and key management. Not only did this failure lead to the Security Breach itself, but it also led to Vendini's delay in discovering the Security Breach and Vendini's failure to promptly notify Consumers.

### Security Breaches Lead to Identity Theft

48.    The United States Government Accountability Office noted in a June 2007 report on Data Breaches ("GAO Report") that identity thieves use personal identifying data to open financial accounts, receive government benefits, and incur charges and credit in a person's name.[21] As the GAO Report states, this type of identity theft is the most harmful, because it may take some time for the victim to become aware of the theft and can adversely impact the victim's credit rating.  In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."

49.    According to the FTC, identity theft wreaks havoc on a consumer's finances, credit history, and reputation and can take time, money, and patience to resolve.[22] Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone

---

[20] Kamala D. Harris, Attorney General California Department of Justice, Data Breach Report of 2012, i, iii (2012), http://oag.ca.gov/sites/all/files/agweb/pdfs/privacy/2012data_breach_rpt.pdf (last accessed Nov. 12, 2013).
[21] See GAO, *Data Breaches Are Frequent, but Evidence of Resulting Idenitty Theft is Limited; However, the Full Extent Is Unknown* 1, 30 (June 2007), *available at* http://www.gao.gov/new.items/d07737.pdf.
[22] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (2012), http://www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf.

or utilities fraud, and bank/finance fraud.[23]

50.     A person whose PII has been compromised may not see any signs of identity theft for *years*. According to the GAO Report:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

51.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for a number of years.[24] As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen credit card numbers and other PII directly on various internet websites making the information publicly available.

### The Monetary Value of Privacy Protections

52.     At a FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information as follows:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy.   Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's

---

[23] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id.*

[24] Companies, in fact, also recognize PII as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand has created a software application that values a person's identity on the black market. Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html. *See also* T. Soma, ET AL, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at \*3-4 (2009).

something on the order of the life blood, the free flow of information.[25]

53.     Though Commissioner Swindle's remarks are more than a decade old, they are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[26]

54.     The FTC has also recognized that consumer data is a new—and valuable—form of currency.  In a recent FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point by observing:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable.  Data is currency.  The larger the data set, the greater potential for analysis – and profit.[27]

55.     Recognizing the high value that consumers place on their PII, many companies now offer consumers an opportunity to sell this information to advertisers and other third parties.  The idea is to give consumers more power and control over the type of information that they share—and who ultimately receives that information.  And by making the transaction transparent, consumers will make a profit from the surrender of their PII.[28]   This business has created a new market for the sale and purchase of this valuable data.[29]

---

[25]     *The Information Marketplace: Merging and Exchanging Consumer Data*, http://www.ftc.gov/bcp/workshops/infomktplace/transcript.htm (last visited May 20, 2012).
[26]     *See Web's Hot New Commodity: Privacy*, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited May 20, 2012).
[27]     *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited May 20, 2012).
[28]     *You Want My Personal Data? Reward Me for It*, http://www.nytimes.com/2010/07/18/business/18unboxed.html (last visited May 20, 2012).
[29]     *See Web's Hot New Commodity: Privacy*, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited May 20, 2012).

56.     Consumers place a high value not only on their PII, but also on the *privacy* of that data.  Researchers have already begun to shed light on how much consumers value their data privacy—and the amount is considerable.  Indeed, studies confirm that "when [retailers'] privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[30]

57.     According to academics and experts in the field of online privacy, security, and human-computer interactions, it is widely known throughout the business industry that consumers are willing to pay increased prices in order to do business with merchants who better protect their privacy by following Federal Trade Commission's ("FTC") guidelines[31] on online privacy.[32]  Since 2004, little research has been performed on whether people value privacy, because it is widely understood that they do.[33]  Rather, research focuses on how much value people place on privacy.  Furthermore, academic research demonstrates that consumers are willing to pay a premium price for stronger privacy protections, which include better protection

---

[30] Hann *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at* http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (emphasis added) (last visited Nov. 11, 2013); Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (June 2011).

[31] U.S. Federal Trade Commission, Privacy Online: A Report to Congress (June 1998), *available at* http://www.ftc.gov/reports/privacy3/toc.htm.

[32] *See* Rust, Kannan, and Peng, *The Customer Economics of Internet Privacy*, 30 J. Acad. Marketing Sci.  455-64 (2002) (noting market for privacy-related services that had arisen due to consumer demand).

[33] *See* Interactive, *Privacy On & Off the Internet: What Consumers Want*, http://www.aicpa.org/download/webtrust/priv rpt 21mar02.pdf, 2001.40 (finding that only 20% of consumers do *not* value data privacy); Taylor, *Most People Are "Privacy Pragmatists" Who, While Concerned About Privacy, Will Sometimes Trade It Off for Other Benefits*, The Harris Poll 17 (March 2003), http://www.harrisinteractive.com/vault/Harris-Interactive-Poll-Research-Most-People-Are-Privacy-Pragmatists-Who-While-Conc-2003-03.pdf (finding that only 10% of consumers do *not* value data privacy).

of their PII.[34] Moreover, research also demonstrates that consumers expect increased data protection when they pay additional money for a service.[35]

58. When consumers were surveyed as to how much they valued their personal data in terms of its protection against improper access and unauthorized secondary use—the two concerns at issue here—they valued the restriction of improper access to their data at between $11.33 and $16.58 per website, and prohibiting secondary use to between $7.98 and $11.68 per website.[36]

59. Given these facts, any company that transacts business with a consumer and then compromises the privacy of a consumers' PII has thus deprived the consumer of the full monetary value of the transaction.

*Damages Sustained By Plaintiff and the Class*

60. In exchange for paying the Service Fee, Plaintiff and the Class expected Vendini[37] to adhere to commercially reasonable data security measures and industry best practices when collecting and storing their PII. Because Plaintiff and the Class were denied their entitled-to privacy protections that they paid for, Plaintiff and the Class incurred actual monetary damages in that they overpaid for Vendini's Service Fee when purchasing their tickets.

61. Plaintiff and the Class suffered additional damages based on the opportunity cost and value of time that Plaintiff and the Class have been forced to expend to monitor their financial

---

[34] *See* Acquisti and Grossklags, *Privacy and Rationality in Individual Decision Making*, IEEE Security & Privacy 24-30 (Jan. – Feb. 2005), *available at* http://www.dtc.umn.edu/weis2004/acquisti.pdf (examining the extent to which consumers are willing to spend additional money in exchange for increased privacy); Huberman, Adar, and Fine, *Valuating Privacy*, IEEE Security & Privacy 22-25 (Sept. – Oct. 2005) (same).

[35] *See* Gideon, Egelman, Cranor, and Acquisti, *Power Strips, Prophylactics, and Privacy, Oh My!*, In Proceedings of the 2006 Symposium on Usable Privacy and Security 133-144 (July 2006) (examining willingness of consumers to pay a premium for additional security).

[36] U.S. Federal Trade Commission, *supra* note 31.

[37] While some consumers may not have known that Vendini, specifically, was processing the transactions, they did have expectations of whoever was actually processing the transaction.

and bank accounts as a result of the Security Breach and the delayed notice. Such damages also include the cost of obtaining replacement credit and debit cards.

## V.     CLASS ACTION ALLEGATIONS

62.     Plaintiff brings Count I, or in the alternative, Count II, as set forth below, on behalf of himself and as a class action, pursuant to the provisions of Rule 23 of the Federal Rule of Civil Procedure on behalf of a class defined as:

**The National Class**

All persons residing in the United States who purchased a ticket using a credit or debit card and whose purchase was processed by Vendini, Inc. at any time up to the Security Breach.

Excluded from the National Class are Vendini and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

63.     Plaintiff brings Count III, as set forth below, on behalf of himself and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of a class defined as:

**The Illinois Class**

All persons residing in Illinois who purchased a ticket using a credit or debit card and whose purchase was processed by Vendini, Inc. at any time up to the Security Breach.

Excluded from the Illinois Class are Vendini and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

64.     "Class members" or "the Class" refer to both the National Class and Illinois Class, unless otherwise stated.

65. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

66. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The Class members are so numerous that their individual joinder herein is impracticable. On information and belief, Class members number in the hundreds of thousands. The precise number of Class members and their addresses are presently unknown to Plaintiff but may be ascertained from Vendini's books and records. Class members may be notified of the pendency of this action by mail, email, internet postings, and/or publication.

67. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. As to the National Class, such common questions of law or fact include:

    a. Whether consumers' payment of Vendini's Service Fee in exchange for using its ticket processing services, constituted an implied contract wherein Vendini was expected to use commercially reasonable methods to secure and safeguard consumers' PII that it collected and stored;

    b. Whether consumers' payment of Vendini's Service Fee in exchange for using its ticket processing services, constituted an implied contract wherein Vendini was expected to adequately and promptly notify consumers of a breach of their PII;

    c. Whether Vendini took reasonable measures to determine the extent of the Security Breach after first learning of it;

    d. Whether Vendini failed to use commercially reasonable methods to safeguard consumers' PII, including, but not limited to, compliance with DSS and industry best practices;

    e. Whether Vendini failed to provide adequate and prompt notice to consumers of the Security Breach;

    f. Whether Vendini's conduct constitutes breach of an implied contract;

g. Whether Vendini retained any benefit by not providing commercially reasonable data security measures for consumers' PII or by not providing prompt notice of the Security Breach to consumers;

h. Whether Vendini would be unjustly enriched by retaining any benefit; and

i. Whether Plaintiffs and the other Class members are entitled to damages, injunctive relief, or other equitable relief.

As to the Illinois Class, such common questions of law or fact include:

a. Whether Vendini's conduct constitutes a deceptive or unfair practice under ICFA;

b. Whether Vendini intended consumers to rely on Vendini's deceptive or unfair practices;

c. Whether Vendini's conduct is a violation of ICFA; and

d. Whether Plaintiffs and the other Class members are entitled to damages, injunctive relief, or other equitable relief.

68. Vendini engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

69. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other Class members because, among other things, all Class members were comparably injured through Vendini's uniform misconduct described above and were thus all subject to the Security Breach alleged herein. Further, there are no defenses available to Vendini that are unique to Plaintiff.

70. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representatives because his interests do not conflict with the

interests of the other Class members he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and Plaintiff will prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiff and their counsel.

71.     **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Class members would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Vendini. The proposed Class thus satisfies the requirements of Fed. R. Civ. P. 23(b)(1).

72.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Vendini has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole.

73.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Vendini, so it would be impracticable for Class members to

individually seek redress for Vendini's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.    CLAIMS ALLEGED

### COUNT I
### Breach of Implied Contract
### (On Behalf of the National Class)

74.    Plaintiff incorporates paragraphs 1- 73 as if fully set forth herein.

75.    Vendini contracted with Venues to provide ticketing services, including the processing of ticket purchases made by consumers using credit and debit cards at the Venue's box-office or online. In exchange for Vendini's services, Vendini charged the Venues a Service Fee.

76.    However, Plaintiff and the National Class paid for the Service Fee and were required by Vendini to provide their PII when purchasing their tickets.

77.    By paying Vendini's Service Fee in exchange for using Vendini's ticketing services, Plaintiff and the National Class entered into an implied contract with Vendini.

78.    Under the implied contract, Vendini was obligated to use commercially reasonable data security measures to protect their PII from a breach.

79.    Vendini breached the implied contract by failing to use reasonable measures to safeguard Plaintiff and the National Class members' PII.

80. Plaintiff and the National Class have suffered injuries in fact and actual damages, including lost money and property as a result of Vendini's breach of the implied contract.

81. Plaintiff and other Class members also suffered injuries by having to order replacement cards and constantly monitor their credit reports as a result of the Security Breach.

82. Plaintiff and the other Class members suffered and will continue to suffer damages, including but not limited to loss of their financial information and loss of money and costs incurred as a result of increased risk of identity theft, all of which have ascertainable value to be proven at trial.

**COUNT II**
**Unjust Enrichment**
**(In the Alternative to Count I)**
**(On Behalf of the National Class)**

83. Plaintiff incorporates paragraphs 1- 73 as if fully set forth herein.

84. In the alternative to Count I, when Plaintiff and the National Class paid for Vendini's Service Fee, they reasonably expected Vendini to use adequate data security measures to protect their PII from unauthorized access.

85. Vendini, however, failed to provide adequate data security measures to protect Plaintiff and the National Class members' PII.

86. Vendini retained the benefits of: (1) the Service Fee and (2) the cost of commercially reasonable and industry-standard data security measures to protect Plaintiff's and National Class members' PII.

87. Retention of this benefit is inequitable, and Plaintiff and the National Class should be compensated by a sum calculable based on the retention of the benefits and the damage suffered as a result of the Security Breach, including overpayment of the Service Fee.

88.     Plaintiff and the other members have suffered injuries in fact and actual damages, including lost money and property as a result of Vendini's conduct and retention of any benefit.

89.     Plaintiff and other Class members also suffered injuries by having to order replacement cards and constantly monitor their credit reports as a result of the Security Breach.

## COUNT III
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
### (On Behalf of the Illinois Class)

90.     Plaintiff incorporates paragraphs 1- 73 as if fully set forth herein.

91.     The ICFA provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

92.     When Plaintiff and the Illinois Class purchased their tickets through a Vendini service, paid the Service Fee, and provided their PII, they expected Vendini to use commercially reasonable data security measures to protect their PII from a breach.

93.     However, Vendini misrepresented or failed to disclose that it would not use commercially reasonable data security measures to protect their PII from a breach.

94.     Vendini's misrepresentations and omissions constitute deceptive and unfair practices under the ICFA.

95.     Vendini also engaged in a deceptive practice by failing to immediately notify Plaintiff and the Illinois Class of the nature and extent of the Security Breach pursuant to the Illinois Personal Information Protection Act, 815 ILCS 530/10, *et seq*., which provides:

Sec. 10. Notice of Breach.

(a) Any data collector that owns or licenses personal information concerning an Illinois resident shall notify the resident at no charge that there has been a breach of the security of the system data following discovery or notification of the breach. The disclosure notification shall be made in the most expedient time possible and without unreasonable delay, consistent with any measures necessary to determine the scope of the breach and restore the reasonable integrity, security, and confidentiality of the data system.

96.     Vendini, by collecting, using, and storing Plaintiff's and the Illinois Class members' PII, is a "data collector that owns or licenses personal information" under 815 ILCS 530/10/2.

97.     A violation of the Personal Information Protection Act constitutes a violation of the ICFA. 815 ILCS 530/20.

98.     Vendini intended for Plaintiff and the Illinois Class members to rely on these deceptive and unfair practices when it required their PII during the ticket purchases and charged a Service Fee.

99.     Plaintiff and the Illinois Class members have suffered injuries in fact and actual damages, including lost money and property as a result of Vendini's violations of 815 ILCS 505/2.

100.    Plaintiff and Illinois Class members also suffered injuries by having to order replacement cards and constantly monitor their credit reports as a result of the Security Breach.

101.    These deceptive or unfair practices took place while Plaintiff and the Illinois Class purchased tickets from Venues using a Vendini service and paid Vendini's Service Fee.

102.    Plaintiff's and Illinois Class members' injuries were proximately caused by Vendini's unfair and deceptive behavior, which was conducted with reckless indifference toward the rights of others, such that an award of punitive damages is appropriate.

## VII.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## VIII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff John Lewert, individually and on behalf of the Class request that the Court enter judgment awarding the following relief:

A.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel for the Class;

B.    Ordering Vendini to pay for not less than three years of credit card monitoring services for Plaintiff and the other Class members;

C.    Ordering Vendini to pay actual damages to Plaintiff and the other Class members;

D.    Ordering Vendini to pay punitive damages, as allowable by law, to Plaintiff and the other Class members;

E.    Ordering Vendini to disseminate individualized notice of the Security Breach to all Class members;

F.    Ordering Vendini to pay attorneys' fees and litigation costs to Plaintiff and the other Class members;

G.    Ordering Vendini to pay both pre- and post-judgment interest on any amounts awarded; and

H.    Ordering such other and further relief as may be just and proper.

Date: December 18, 2013                    Respectfully submitted,

                                           JOHN LEWERT, individually and on behalf
                                           of all others similarly situated


                                           By:_____
                                               One of the Attorneys for Plaintiff
                                               And the Proposed Putative Classes

Joseph J. Siprut
*jsiprut@siprut.com*
Gregg M. Barbakoff
*gbarbakoff@siprut.com*
Ismael T. Salam
*isalam@siprut.com*
SIPRUT PC
17 N. State Street
Suite 1600
Chicago, Illinois 60602
312.236.0000
Fax: 312.470.6588

4851-4816-6934, v. 3